## ROBERTS *v.* NORTHERN PACIFIC RAILROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF WISCONSIN.

No. 124. Argued December 17, 18, 1894. — Decided April 22, 1895.

Where a railroad company, having the power of eminent domain, has entered into actual possession of lands necessary for its corporate purposes, whether with or without the consent of their owner, a subsequent vendee of the latter takes the land subject to the burthen of the railroad, and the right to payment from the railroad company, if it entered by virtue of an agreement to pay, or to damages if the entry was unauthorized, belongs to the owner at the time the railroad company took possession.

If a land owner, knowing that a railroad company has entered upon his land, and is engaged in constructing its road without having complied with a statute requiring either payment by agreement or proceedings to condemn, remains inactive and permits it to go on and expend large sums in the work, he is estopped from maintaining either trespass or ejectment for the entry, and will be regarded as having acquiesced therein, and will be restricted to a suit for damages.

So far as it was within the power of the State of Wisconsin, through and by its legislature, to authorize the county of Douglas, in that State, to contract with the Northern Pacific Railroad Company for the construction of its road within that county on a designated line, and to estab-

1

lish a lake terminus within the same, and upon the fulfilment of those conditions to convey to it certain of its unsettled public lands, that power was conferred and the contract between the county and the railroad company in respect thereof was ratified by the act of March 23, 1883; and, if there was any want of regularity in the proceedings of the county, it was thereby waived and corrected.

Said grant was made on a valuable consideration, which was fully performed when the railroad company had constructed its road and had established the lake terminus in the county as it had contracted to do; and the company then became entitled to a conveyance of the lands, and so far as the Supreme Court of Wisconsin can be regarded as having held to the contrary, the courts of the United States are not bound to follow its decision when applied to a corporation created by an act of Congress, for National purposes, and for interstate commerce.

Error cannot be imputed to a court for refusing to allow an amendment or supplement to an answer, after the case had progressed to a final hearing, nor to its judgment in disregarding the allegations of such proposed amendment.

Applying to this case the rules in regard to estoppel laid down in *Cromwell* v. *Sac County*, 94 U. S. 352, it is *Held*, that the question or point actually litigated in the state court in *Ellis* v. *Northern Pacific Railroad*, 77 Wisconsin, 114, was not the same with those before the Federal court in this case, and hence, as the causes of action in the two courts were not the same, the judgment in the state court, while it might determine the controversy between the parties to it as respects the pieces of land there in question, would not be conclusive in another action upon a different claim or demand.

THIS was a bill in equity filed in the Circuit Court of the United States for the Western District of Wisconsin in December, 1889, by the Northern Pacific Railroad Company, a corporation organized under and by virtue of an act of Congress approved July 2, 1864, against David E. Roberts, J. F. Ellis, and Euclid L. Johnson, wherein the complainant sought to quiet its title to certain lands in Douglas County, Wisconsin.

The railroad company claimed title to the lands in question under an agreement of purchase and a deed of conveyance from the county of Douglas. The defendants set up a title under a subsequent deed of conveyance from the same county. After certain pleas and demurrers on behalf of the defendants, Roberts and Ellis, were overruled, the case was disposed of on bill and answer, and a final decree was rendered in favor

of the complainant against Roberts and Ellis, and dismissing the bill without prejudice as to Johnson. From which decree an appeal was taken by Roberts and Ellis to this court.

The record discloses that an agreement was made on December 16, 1880, between the Northern Pacific Railroad Company and the county supervisors of Douglas County, whereby the former undertook to construct, complete, and equip its line of railroad through Douglas County by a route proposed by the county, and to erect certain wharves and docks to make a connection between the railroad and Lake Superior, and in consideration of this the county agreed to sell and convey certain parcels of land of which the county had become possessed by sales for unpaid taxes.

On January 16, 1882, the county board, by resolution, after reciting that the railroad company had complied with the terms of the agreement, authorized a deed of conveyance of the lands to be executed and delivered to the company. In the deed there was an acknowledgment of the receipt of one dollar in hand paid, and of the performance by the company of its part of the agreement. This deed, dated January 20, 1882, was duly recorded in the office of the register of deeds of Douglas County.

The bill alleged that the company had expended in the construction of the main line from the Northern Pacific junction through Douglas County to Superior, and in the construction of proper depots, side tracks, and connections, the sum of $542,098.78; in the construction of the bay front line to Conner's Point, the terminus called for in the agreement, the sum of $93,423.91; and in the construction of a dock or pier in the bay of the town of Superior the sum of $116,249.73. It was also alleged in the bill, and not denied in the answer, that at the time when the county proposed to dispose of said lands to the company said lands were non-taxable and yielded no income whatever to the county, and that ever since they were conveyed to the company the latter had in each and every year paid the taxes levied thereon, and had expended large sums of money in the payment of such taxes, to wit, more than five thousand dollars; that its title to said lands

remained undisputed by any one during all the time from said January 20, 1882, until the month of July, 1888; and that, in the meantime, the company had sold and conveyed various parcels of said lands to many different persons, and whose titles are based upon said deed of the county to the company.

On the 6th day of July, 1888, and on the 7th day of March, 1889, the county clerk of said county, in pursuance of a resolution of the board of supervisors, made deeds of those dates to the plaintiff in error, Roberts, for an alleged consideration of $385.

The other facts of the case are sufficiently stated in the opinion.

*Mr. William F. Vilas* for appellants.

I. The Supreme Court of Wisconsin, interpreting and enforcing the constitution of the State, has authoritatively adjudged that no municipal corporation, county, town, or city can bestow public property upon a railroad company as an aid or inducement to its building any line of road. Long before the transaction in question, repeated decisions of the court declaring and recognizing this law had been made and published, and the constitutional limitation so settled was notorious.

This proposition will not be questioned.

In 1869, at its June term, the Supreme Court of the State rendered its judgment in the locally famous case of *Whiting* v. *Sheboygan and Fond du Lac Railroad Company,* 25 Wisconsin, 167, by which it was decided that the state constitution denied all power or right in municipal corporations to give public property for private purposes, or even for such quasi-public purposes as railroads, and prohibited the legislature from conferring such power by any act; that stock subscriptions to railroads, although a breach of the rule, had by so many decisions been so long tolerated as to have secured place as an exception; but beyond that exception the constitutional limitation must be imperatively observed and maintained. After review of it, with elaborate arguments, upon a

motion for rehearing, the court adhered to this interpretation, and filed an additional opinion at the January term, 1870.

In 1871, at its June term, in *Phillips* v. *Albany*, 28 Wisconsin, 340, the court, affirming the exception in favor of a stock subscription, under the rule *stare decisis*, reiterated its determination to adhere to the limitation declared in the *Whiting case.*

Again, in 1872, in *Rogan* v. *Watertown*, 30 Wisconsin, 259, the *Whiting case* was referred to with approbation.

In 1878, in *Bound* v. *Wisconsin Central Railroad*, 45 Wisconsin, 543, there was renewed expression by the court of its adherence to the prescribed limitation.

From the decision in the *Whiting case* to this day, there has never been the least qualification of or variation from that interpretation, nor want of complete understanding or acceptance of it by the profession and the public. Much additional notoriety was given to that construction because this court, in *Olcott* v. *The Supervisors*, 16 Wall. 678, disagreed with the state court in opinion, and, having the basis that the county orders in question had been issued before the interpretation was declared and while a different one had received colorable support at least, sustained and enforced the same obligations the Supreme Court of the State had adjudged invalid in the *Whiting case.*

It cannot, therefore, be open to question that under the state constitution, as authoritatively construed by the highest state tribunal, the transaction between the county board of Douglas county and the appellee, and as well the act of the legislature subsequently procured in the attempt to validate it, were without legal force and effect; nor could it be doubtful beforehand that such would be the judgment of the state Supreme Court, adhering to its line of decisions. No hope of a different result in that tribunal could be entertained, except by its complete reversal of former judgments and the overthrow of the constitutional limitation as theretofore adjudged to exist; and, in point of fact, that was the exact and only effort of the railroad company, in argument on the subject in the state court.

When, therefore, the Supreme Court of Wisconsin was presented by the company's appeal with the action first brought by the appellant Ellis, as before stated, it naturally inevitably said, *Ellis* v. *Northern Pacific Railroad*, 77 Wisconsin, 118, 119 : "There is nothing to distinguish this case, or to take it out of the decision in the *Whiting case;* for if the county could not donate money or securities to a railroad corporation, it could not give it its lands, which are the property of the county."

And in response to the attempt to reverse the interpretation given the constitution in former years, it said : "And while the distinction between a stock subscription and a donation or other appropriation of public money or corporate property to a railroad corporation is not very distinct and obvious, yet we are unwilling to extend a bad rule of law a particle beyond where the courts had carried it, and shall, therefore, adhere to the doctrine of the *Whiting case.* Besides, that case has been fully approved in subsequent cases in this court;" and reference is thereupon made to those already above referred to. The invalidity of the act of the legislature of 1883 inevitably follows, the court saying, of course : "But if the legislature could not authorize the county in the first instance to donate its lands to the railroad company, it could not cure or make valid such a donation after it had been made."

II. The general principle that the Federal courts are bound to accept the construction of a state constitution or state statute, and to follow the rule of decision in matters of local, intra-state concern, settled and maintained by the Supreme Court of the State, has been too long established by the decisions of this court to require argument or recall of cases.

Undeniably, that rule must govern the decision now unless this case falls within some just and recognized exception. Here rises the first contention, and its consideration requires not only careful attention to the exceptions established by the judgments of this court, but justifies close review of the reasons which support the general doctrine as well as particular exceptions.

The foundation of all the reasons for the general principle, and as well for the just exceptions, lies in the nature of the relations between the Federal and state governments. In all judicial controversies involving the powers and dignity of the Federal government, the interpretation of its laws and treaties, the authority or responsibility of its officers, as in all involving the rights of different States in a particular subject, and some between a State and persons, citizen or alien, the final supremacy of this court is as natural and necessary as it is indubitably given by the constitution. In its own learning, wisdom, and fidelity, lie the springs of all such judgments. All extraneous aids are advisory, carrying no authority but in the strength of good counsel. It is the judicial law-giver of the Federal nation, and its doctrines command the rightful reverence due its lofty jurisdiction quite as well as its particular judgments enjoy the power of the Federal government for their enforcement.

But within the State the Supreme Court thereof is equally entitled to a like supremacy in all judicial controversies involving the interpretation of the state constitution and laws, the powers and limits of all its inferior political divisions, corporations, and agencies, the responsibility and authority of all its public officers, and all subjects of local intra-state concern, save only when these affect Federal relations or touch somewhere a line of the Federal constitution. Within the confines of the State its Supreme Court is as justly the judicial law-giver as this court in the nation, and its doctrines, in their application to every subject there confined, are entitled to the respect due the highest jurisdiction of human society.

To such intra-state subjects the jurisdiction of the Federal court can but occasionally and fortuitously extend, resting mainly on the accident or circumstance of the citizenship of one of the parties. The honest mind is thus coerced to recognize that, while the power to render as to enforce its judgment still flows to the Federal court from the Federal government, the law of the State must determine that judgment and its judicial law-giver guide to knowledge of that law.

The obligation to respect the law of a State as settled by

its Supreme Court is not matter of judicial comity ; it stands on the duty to adjudge the law as it is, the duty of respect and obedience justly owing to human government in its best possible form and estate. It is peculiarly incumbent on this great tribunal because, albeit from necessity, the Federal constitution has entrusted to its supreme protection and care the novel and delicate principles of the Federal system, with power to trample on it, not less than the duty to observe it.

III. The state court of Wisconsin first acquired a complete jurisdiction over this entire controversy ; it was adequate to its full determination ; the opinion of the highest court of the State, invoked by the appellee, and conclusive against the deed by which it claims, was rendered before the hearing of this cause in the lower court ; and it ought to have been respected as an estoppel.

That the decision of the state Supreme Court in the action of Ellis against this appellee is in law of itself a complete estoppel, seems too obvious for discussion. Assume, for a clear view, that this suit was not brought until after the final judgment on the last appeal in that case.

It would then stand that Ellis in privity of estate with Roberts by virtue of the latter's grant, had obtained final judgment that the deed of the county of Douglas to the appellee was null and void and passed no title to the seven lots or parcels to which that suit extended. So far it assuredly now is an absolute bar. But equally absolute it must be as an estoppel against the appellee in favor of Ellis and Roberts in at least any *subsequent* action or suit, because the invalidity of the entire deed of conveyance, to all lands described in it, not less than the seven pieces, was the exact and essential point in judgment.

In *Cromwell* v. *Sac County*, 94 U. S. 351, the distinction between the force of a judgment as a bar and as an estoppel is clearly presented, and the conclusiveness of the estoppel shown.

Not less certain is it that when once upon a writ of error or intermediate appeal the judgment of the highest court has been rendered upon any point in controversy, the resolution

reached is *res judicata,* not to be reversed even by the same court on any subsequent presentation of the same case. The rule has been often enforced by this court, as by others, and in Wisconsin such has been the force of an intermediate judgment since the earliest cases.

The Supreme Court of Wisconsin, in the judgment which this appellee had invoked by its appeal from the order of the state circuit court overruling its demurrer to the complaint of Ellis, had, therefore, conclusively adjudicated as between these parties that the deed from Douglas County to the appellee passed no title, and that the attempted cure of its invalidity by the act of the legislature was futile because the legislature possessed no constitutional power to pass it. *Ellis* v. *Northern Pacific Railroad,* 77 Wisconsin, 114. This decision controlled and substantially ended the litigation, for nothing else remained to be litigated; although by the practice prevailing in the State the defendant had leave formally to answer over; so that when again the defendant appealed, the complete response of the Supreme Court was that the case had been already adjudicated. There remained nothing to consider. *Ellis* v. *Northern Pacific Railroad,* 80 Wisconsin, 459.

And this judgment was rendered *before* the hearing of this case in the court below. Irrespective of the doctrine requiring acceptance of the law from the rule of decision in the State, this judgment ought to have been respected as an estoppel of the point in litigation.

*Mr. A. H. Garland* and *Mr. James McNaught* for appellee.

*Mr. John C. Spooner* filed a brief for same.

MR. JUSTICE SHIRAS, after stating the case as above, delivered the opinion of the court.

So far as those portions of the lands, described in the bill of complaint, consist of parcels held and used by the railway company for the necessary and useful purposes of their road as a public highway, it is obvious that the title and possession thereof cannot be successfully assailed by the appellants. The

latter became purchasers long after the railroad company had entered into visible and notorious possession of these portions of the lands, and had constructed the roads, wharves, and other improvements called for by their contract with the county.

It is well settled that where a railroad. company, having the power of eminent domain, has entered into actual possession of land necessary for its corporate purposes, whether with or without the consent of the owner of such lands, a subsequent vendee of the latter takes the land subject to the burthen of the railroad, and the right to payment from the railroad company, if it entered by virtue of an agreement to pay, or to damages, if the entry was unauthorized, belongs to the owner at the time the railroad company took possession.

In *Schuylkill Nav. Co.* v. *Decker*, 2 Watts, 343, where there was a claim for damages caused to land by the construction of a canal, and where the land had been subsequently, conveyed to a third person, it was held by the Supreme Court of Pennsylvania that such purchaser was not entitled to recover. The court said, per Chief Justice Gibson to this claim : " It is a decisive objection that the plaintiff has not a title to the damages, which, being in compensation of an injury in the nature of a trespass, could not pass by mere conveyance of the land. In like manner the conveyance of a party wall does not entitle the grantee to contribution from the adjoining owner, it being held in *Hart* v. *Kucher*, 5 Serg. & Rawle, 1, that the claim is satisfied by payment to the first builder, though the purchaser had not notice of it ; and, on the same principle, it was held in *Commonwealth* v. *Shepard*, 3 Penn. 509, that the claim to compensation under the act adjusting the titles to land in , . . . Luzerne and Lycoming counties is personal, and does not pass by a conveyance of the land. Granting the compensation here to be, what it certainly is, the price of a perpetual easement, it is impossible to imagine a title to it in a subsequent grantee of the land subject to the easement.".

And in *McFadden* v. *Johnson*, 72 Penn. St. 335, the same court held that the, damages to land, occasioned by the construction of a railroad, were a personal claim by the owner

when the injury occurred — that they did not run with the land, nor pass by a deed, though not reserved.

Numerous authorities to the same effect may be found collected in Wood on Railroads, vol. 2, p. 994; and the conclusion established by the decisions is there said to be that the damages belong to the owner at the time of the taking, and do not pass to a grantee of the land under a deed made subsequent to that time, unless expressly conveyed therein.

So, too, it has been frequently held that if a land owner, knowing that a railroad company has entered upon his land and is engaged in constructing its road without having complied with the statute, requiring either payment by agreement or proceedings to condemn, remains inactive and permits them to go on and expend large sums in the work, he will be estopped from maintaining either trespass or ejectment for the entry, and will be regarded as having acquiesced therein, and be restricted to a suit for damages. *Lexington & Ohio Railroad* v. *Ormsby,* 7 Dana, 276; *Harlow* v. *Marquette, &c. Railroad,* 41 Michigan, 336; *Cairo & Fulton Railroad* v. *Turner,* 31 Arkansas, 494; *Pettibone* v. *La Crosse and Milwaukee Railroad,* 14 Wisconsin, 443; *Chicago & Alton Railroad* v. *Goodwin,* 111 Illinois, 273.

It is not pretended that Roberts, the subsequent purchaser, acted in ignorance of the railroad company's title. On the contrary, in the answer it is alleged that " the defendant, Roberts, purchased said lands from said county in good faith and for the consideration named, which was the actual value of the title to said lands, the value of such title having been greatly impaired and rendered almost valueless by the cloud upon the same created by said resolutions of the county board and such conveyance by the county clerk and such legislative act." So far, then, from being a purchaser for a valuable consideration without notice, Roberts actually avows that he bought lands worth over two hundred thousand dollars, and upon which, as alleged in the bill and not denied in the answer, the railroad company has expended, in the construction of its road and the erection of depots and docks and piers, several hundred thousand dollars, for the nominal sum of three hundred and

eighty-five dollars, and that he secured this bargain because the outstanding and well-known title of the railroad company, originating in the county's contract and deed, confirmed by the act of the legislature, "greatly impaired and rendered almost valueless" the title so purchased by Roberts.

The conclusion, therefore, seems warranted that, as to those portions of the lands in question which are occupied and used by the railroad company, the county having stood by for years, and permitted the company to proceed in the construction of its road and appurtenances at a vast expense, and having accepted large sums as taxes, would be estopped from interfering with the possession of the railroad company. *A fortiori*, it follows that Roberts, buying with notice, could not maintain either trespass or ejectment *for such portions*, nor would he, as such purchaser, be entitled to recover damages for the occupation thereof.

The foregoing observations apply only to those portions of the lands in question which have been actually occupied and used by the railroad company for corporate purposes, or, in other words, to such lands as the railroad company could have condemned by the exercise of its right of eminent domain.

But, as it appears in the bill and answer, that considerable portions of the land in dispute are not held or occupied by the railroad company for its necessary public purposes, but for sale to others, and presumably could not have been procured by the company under its power of condemnation, other questions are raised for our consideration.

And, first, it is claimed that the county, in granting such lands to the company, made a donation of them, or, in other words, that the company became possessed of them without having given any legal consideration therefor, and that the county was disabled by law from so parting with its property.

A natural observation, when this proposition is presented, is, that the county does not appear to have ever attempted to rescind or withdraw from the transaction. As already said, the railroad company proceeded to construct its road and expend its money on the faith of the grant, during a period of several years, the county not objecting, and, indeed, contin-

uing to recognize the company's title by accepting the annual taxes. Nor is the county now a party to the attempt to deprive the company of its property. Should these appellants succeed in appropriating to themselves the lands in question, their success would not inure to the benefit of the county. The only pretence of authority from the county to assail the company's title is found in the quitclaim deeds executed to the defendant Roberts by the county clerk, pursuant to a resolution of the board of supervisors of the county, in 1888, for an alleged consideration of three hundred and eighty-five dollars. Whatever might be the result in a court of law of a contest between these respective grantees of the county, it may well be doubted whether a court of equity could be successfully appealed to by a purchaser from the county of property worth upwards of two hundred thousand dollars for a nominal consideration of less than four hundred dollars. If the county had found that it had been overreached in its bargain with the railroad company, or had learned that its grant of these lands was invalid for want of power, and had come into a court of equity, offering to do equity by an offer to return or account for the consideration received, the condition of things would have been different from what it now is. In such a proceeding the rescission would have inured to the benefit of the taxpayers of the county ; but, under the present claim, the benefit would go to a private party, who bought with knowledge of the county's previous sale, and who admits in his answer that he secured his own grant for a grossly inadequate consideration because of the fact of such previous sale.

Nor can it be said that these observations do not apply to Roberts and Ellis, who, as defendants in the equity proceedings, may claim to be regarded as involuntary parties, for, in their answer, they do not content themselves with denying the complainants' title, but offer to do equity, to an insignificant extent, by offering to return the amount of the taxes paid, and themselves pray for the decree that their title may be established, and for such other and further relief as may be proper and agreeable to equity.

So far, at least, as the claim of Roberts and Ellis to affirmative equitable relief is concerned, we think that they cannot, in the circumstances disclosed, be permitted to assert the supposed invalidity of the county's grant to the railroad company.

Our argument has heretofore proceeded on the assumption that the grant by the county to the railroad company was a donation, a mere gift, and, therefore, in view of cited decisions of the Supreme Court of Wisconsin, beyond the power of the county, and invalid ; and our conclusions, upon that assumption, and as respects those portions of the lands which have been subjected to use as a public highway, are that the county, much less its subsequent grantees with notice, cannot, in the state of facts disclosed by this record, disturb the possession of the railroad company ; and that, as respects those other portions of the lands, which the railroad company could not have taken by the exercise of its power of eminent domain, and as to which the company must depend upon the validity of the county's grant, the defendants, as purchasers with notice and upon an inadequate consideration, are in no position to invoke the assistance of a court of equity.

But it is contended on behalf of the railroad company that the assumption that the county's grant was a mere gift, a donation without consideration, and therefore void as against the county and its subsequent grantees, is unfounded ; that the transaction was really a sale within the legitimate powers of the county and the railroad company, and that the company, having performed its part of such sale by the payment of the consideration, is entitled to the protection of a court of equity against such a claim as is set up by Roberts and Ellis.

Our next inquiry, therefore, is whether the railroad company was entitled to that part of the decree of the court below which confirmed their title to such portions of the lands as they could not have appropriated under their power of eminent domain. Was it within the power of the county to sell, and of the company to buy, such lands ; and, if such powers were possessed, were they validly exercised ?

There is no room for doubt that the railroad company was

legally competent to receive a grant of lands, to enable it to construct and maintain its road. The Northern Pacific Railroad Company was organized under and by virtue of the act of Congress, approved July 2, 1864, c. 217, 13 Stat. 365, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound, on the Pacific coast, by the northern route," in which act it was, among other things, provided that "the said company is authorized to accept to its own use any grant, donation, power, franchise, aid, or assistance which may be granted to or conferred upon said company by the Congress of the United States, by the legislature of any State, or by any corporation, person, or persons; and said corporation is authorized to hold and enjoy any such grant, donation, loan, power, franchise, aid, or assistance, to its own use for the purpose aforesaid." And by an act of the legislature of the State of Wisconsin, approved April 10, 1865, the company was, for the purposes set forth in said act of Congress, and to carry the same into full effect, vested with all the rights, powers, privileges, and immunities, within the limits of the said State of Wisconsin, which were given by said act of Congress within the territorial jurisdiction of the United States.

In September, 1880, the railroad company, having theretofore constructed its railroad and telegraph line to a point in the State of Minnesota, was about to select the point or points on Lake Superior to which their said line should be extended. In this condition of affairs the authorities of the county of Douglas, desiring to secure the extension of the railroad through their territory, and the establishment of a lake terminus within the same, made a proposal to the company to transfer by sufficient deed or deeds to the company all the alienable lands or lots belonging to the county which had been acquired by deed, to which the county had held undisputed title for more than two years, if the company would construct their road upon a route desired by the county and establish a terminus, with sufficient docks, and piers suitable for the transfer of passengers and freight from the railroad cars to and from lakegoing craft, within the limits of the county.

This proposal was accepted by the railroad company, and a contract to that effect was entered into between the parties, and, in pursuance thereof, the railroad company, during the year 1881, constructed and equipped its line of railroad upon the route selected by the county, and built the docks and piers and other structures called for by the contract, expending in so doing the sum of about $740,000. On January 16, 1882, the county board by a resolution, reciting that the railroad company had complied with the terms of the contract and had performed its part thereof, authorized the execution of the proper deeds; and thereupon a deed was executed and delivered to the railroad company, conveying, among other lands, those in dispute. This deed was, on the same day, duly recorded in the office of the register of deeds of Douglas County. Ever since the company has maintained and operated its road and wharves, and has paid and the county has received annual taxes, amounting to about five thousand dollars.

By an act, approved March 23, 1883, c. 150, Sess. Laws 1883, 113, the legislature of the State of Wisconsin enacted as follows: "Any conveyance heretofore made by the county of Douglas to the Northern Pacific Railroad, under and in pursuance and satisfaction of resolutions of the county board of said county, dated September 7, 1880, is hereby declared to be valid and effectual to vest in the Northern Pacific Railroad Company the title to the lands conveyed or attempted to be conveyed by such conveyance; and any assignment of tax certificates heretofore made to the said railroad company, upon the property, or any part thereof, embraced in or conveyed by said conveyance, pursuant to and in satisfaction of and in compliance with said resolutions, is hereby declared to be valid."

Thereafter the railroad company sold and conveyed, for value, portions of these lands to third parties.

So far then, as it was within the power of the State of Wisconsin, through and by its legislature, to authorize the county of Douglas to make the contract in question, it must be regarded as granted by or, at any rate, ratified by, said statute, and, if there was any want of regularity in the pro-

ceedings of the county in making the same, such irregularity must be deemed to have been waived and corrected.

But it is contended that, despite the making of the contract between the county and the company, the fulfilment by the latter of the condition and terms prescribed, the execution and delivery of a deed of conveyance, and the ratification and confirmation of the transaction by an act of the legislature, the contract and conveyance were nevertheless void, because the grant was a mere donation, without consideration, and hence forbidden by the constitution of the State of Wisconsin, as construed and interpreted by the Supreme Court of that State.

To maintain this position the appellants cite the case of *Whiting* v. *Sheboygan & Fond du Lac Railroad*, 25 Wisconsin, 167, in which it was held, by a divided court, that the erection and maintenance of a railroad, as a public highway, by a company endowed with the right of eminent domain, was not such a public use or purpose as will support taxation for raising money to be donated to such a corporation.

In so holding, that court reached a conclusion different from that established in a long and almost unbroken line of judicial decisions in the courts of most of the States. As is stated in Dillon's Municipal Corporations, vol. 1, sec. 158, "the Supreme Court of the United States, following repeated intimations of its judges in previous cases, have directly sustained the validity of legislative acts authorizing municipal aid to railways. In view of the prior adjudications of that tribunal in the municipal bond cases, and of the almost uniform holding of the state courts, no other result could have been anticipated. This ends judicial discussion if it does not terminate doubts. The Supreme Court, in reaching this result, places its judgment upon the ground that highways, turnpikes, canals, and railways, although owned by individuals under public grants, or by private corporations, are *publici juris;* that they have always been regarded as governmental affairs, and their establishment and maintenance recognized as among the most important duties of the State, in order to facilitate transportation and easy communication among its

different parts; and hence the State may put forth, in favor of such improvements, both its power of eminent domain, as it constantly does, and its power to tax."

It is contended, on behalf of the plaintiffs in error, that where the question involves the powers of a state corporation, and the meaning and effect of the constitution and laws of a State, it is the duty of this court to adopt the decisions of the courts of such State. But we do not perceive that the doctrine of *Whiting* v. *Sheboygan & Fond du Lac Railroad* and of the cognate Wisconsin cases, is fairly applicable to the case before us. There are two very important particulars in which the present case differs from those adjudicated by the Wisconsin courts, and which, we think, warrant an opposite conclusion. In the first place, the transaction between the county of Douglas and the Northern Pacific Railroad Company did not involve the exercise of the taxing power of the county. The county did not issue bonds, or seek to subject itself to any obligation to raise money by taxation. The case, as already stated, was that of a sale. The county authorities had ample powers to sell and convey such of its lands as were not used or dedicated to municipal purposes. The ratifying act of the legislature of Wisconsin, alone considered, avails to remove any doubt upon that point. Nor can the plaintiffs in error consistently deny such a power in the county, as their only title is based on its exercise. It is, indeed, urged that the county authorities could only sell its lands for money. We do not accede to this proposition. If they possessed the power to sell for money, we are pointed to no express provision of law that restricts them from selling for money's worth. Even upon such a narrow view, it may well be contended that the consideration received by the county included a money payment. The deed recites the payment of money by the company to the county at the time of the conveyance, and it is a conceded fact that the lands since they came into the possession of the company have yielded considerable sums as taxes to the county. It is straining no principle of law or of good sense to regard the payment of an annual tax as equivalent, for the purpose of our present inquiry, to the payment of

a rent. The amount, as well as the nature of the consideration received by the county in exchange for its lands, if it had the power to sell them, was a matter that concerned the county only. The State, as we have seen, did not only not complain, but fully ratified the sale.

The courts of Wisconsin have, in a series of decisions never overruled, held that it is competent for municipal corporations, if authorized so to do by the legislature, to aid the construction of railroads by subscribing to the stock of companies formed for that purpose, and paying therefor by bonds, and, of course, to raise the means of paying the latter by taxation. The task of reconciling this class of decisions with that holding that municipalities, even with legislative sanction, cannot promote railroads by donating money or credit to them, is not ours. It may, perhaps, be said that what is forbidden is a resort to the taxing power where the muncipality has received no consideration. But, as we have shown, the county in the present case paid no money and issued no bonds requiring any exercise of the taxing power. It was the case of a sale, in consideration of money paid down and to be paid in the form of taxes, in addition to the great advantages to inure to the public.

There is a second important feature that distinguishes this case from those relied upon now by the appellants, and that is the character of the railroad company, as a corporation created for public and national purposes. The Wisconsin courts were dealing with corporations of their own State, and they went upon the proposition that the construction and maintenance of railroads did not constitute a public purpose, because the corporations created to build and run railroads were strictly private corporations formed for the purpose of private gain. If the making and maintaining a railroad in Wisconsin by a state corporation was not a public use, it was thought to follow that such an enterprise could not receive municipal aid. And it may be conceded that, when we are called upon to pass upon the legal rights of a Wisconsin railroad company, we should follow the law laid down by the state courts. But the question now arises whether such a

proposition is applicable to the case of a corporation created by a law of the United States, and subjected by its charter to important public duties. The Northern Pacific Railroad Company was incorporated by the act of Congress approved July 2, 1864, already referred to. It was authorized to lay out, construct, and maintain a continuous railroad and telegraph line, with the appurtenances, from a point in the State of Minnesota or Wisconsin on Lake Superior to some point on Puget's Sound, and "for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, munitions of war, and public stores over the route of the said line of railway," there was granted a large amount of public lands and a free right of way through the Territories of the United States. It was made the duty of the company to permit any other railroad which should be authorized to be built by the United States, or by the legislature of any Territory or State in which the same may be situated, to form running connections with it on fair and equitable terms. The company is authorized to enter upon, purchase, or condemn by legal proceedings any lands or premises that may be necessary and proper for the construction and working of said road. It is enacted that all people of the United States shall have the right to subscribe to the stock of the company until the whole capital is taken up; that no mortgage or construction bonds shall ever be issued by said company on said road, except by the consent of the Congress of the United States; that said railroad, and any part thereof, shall be a post route and a military road, subject to the use of the United States for postal, military, naval, and all other government service, and also subject to such regulations as Congress may impose restricting the charges for such government transportation, and that said company shall obtain the consent of the legislature of any State through which any portion of said railroad line may pass previous to commencing the construction thereof; but said company may have the right to put on engineers and survey the route before obtaining the consent of the legislature.

By an act approved April 10, 1865, c. 485, the legislature

of the State of Wisconsin declared that, for the purposes set forth in said act of Congress, and to carry the same into full effect, the Northern Pacific Railroad Company was vested with all the rights, powers, privileges, and immunities within the limits of the State of Wisconsin which were given by said act of Congress.

It is obvious that the effect of this legislation of Congress was to grant the power to construct and maintain a public highway for the use of the people of the United States, and subject, in important respects, to the control of Congress. That portion of its road that lies within the State of Wisconsin is of the same public character as the portions lying in other States or Territories. Whatever respect may be due to decisions of the courts of Wisconsin defining the character and powers of Wisconsin corporations owning railroads, the scope of those decisions cannot be deemed to include the case of a national highway like that of the Northern Pacific Railroad Company. All of the great transcontinental railroads were constructed, under Federal authority, through Territories which have since become States. Such States are possessed of the same powers of sovereignty as belong to the older States. Hence, if the contention were true that the State of Wisconsin, through its judiciary, can deprive that portion of the railroad within its borders of its national character, and declare the Northern Pacific Railroad Company to be a private corporation not engaged in promoting a public purpose, the same would be true of the other States through which the road passes. Such a contention, we think, cannot be successfully maintained.

Congress has power "to regulate commerce with foreign nations and among the several States," and to "establish post offices and post roads." Const. art. 1, sec. 8, par. 3 and 7. As was said in *Pensacola Tel. Co.* v. *West. Union Tel. Co.*, 96 U. S. 110: "The government of the United States, within the scope of its powers, operates upon every foot of territory under its jurisdiction. It legislates for the whole nation, and is not embarrassed by state lines. Its peculiar duty is to protect one part of the country from encroachments by an-

other upon the national rights which belong to all;" and it was held, that a law of the State of Florida which attempted to confer, upon a single corporation of its own, the exclusive right of transmitting intelligence by telegraph over a certain portion of its territory, was inoperative against a corporation of another State, where Congress had enacted "that any telegraph organized under the laws of any State should have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States," and where such other corporation had secured a right of way by private arrangements with the owners of the lands. This principle has been repeatedly recognized by this court in numerous decisions. *Telegraph Co.* v. *Texas,* 105 U. S. 460.

In *Osborn* v. *United States Bank,* 9 Wheat. 738, 823, it was held that a suit by or against a corporation of the United States is a suit arising under the laws of the United States, and that, on jurisdiction thus attaching in the Federal courts, the judicial power is extended to the whole case. In the course of the opinion Chief Justice Marshall observed: "The charter of incorporation not only creates it, but gives it every faculty which it possesses. The power to acquire rights of any description, to transact business of any description, to make contracts of any description, to sue on those contracts, is given and measured by its charter, and that charter is a law of the United States. This being can acquire no right, make no contract, bring no suit, which is not authorized by a law of the United States. It is not itself the mere creature of a law, but all its actions and all its rights are dependent on the same law."

In *Pacific Railroad Removal Cases,* 115 U. S. 1, 18, *Osborn* v. *United States* was followed, and it was held that corporations of the United States created by and organized under acts of Congress are entitled as such to remove into the Circuit Courts of the United States suits brought against them in the state courts, on the ground that such suits are suits "arising under the laws of the United States." In that

case one of the subjects of contention was as to the legal character of the Union Pacific Railway Company. It appeared that the original company was authorized by the act of Congress of July 1, 1862, to extend its road into the State of Missouri — that is, "to construct a railroad and telegraph line *from* the Missouri River at the mouth of Kansas River, on the south side thereof [which is in the State of Missouri], so as to connect with the Pacific Railroad of Missouri, *to* the aforesaid point on the one-hundredth meridian of longitude," namely, the point where the Union Pacific was to commence. This provision looked to the establishment of a continuous line of railroad from the Mississippi River (the eastern terminus of the Pacific Railroad of Missouri) to the Pacific Ocean ; and this court said, by Mr. Justice Bradley : "The power assumed by Congress in giving this authority to the Kansas company was, undoubtedly, assumed to be within the power 'to regulate commerce among the several States;' and, although by an act of the legislature of Missouri, passed in February, 1865, the consent of that State was also given to the extension of the road into its territory and to its connection with the Missouri road, the fact remains that the company claimed and assumed to exercise its powers under the act of Congress, as well as by the consent of the legislature of Missouri. So that the right of appropriating the property in question in this case was claimed under authority of an act of Congress. This circumstance adds strength to the claim of the plaintiff in error that the case was one arising under the laws of the United States."

We think, therefore, that when the Circuit Court of the United States for the District of Wisconsin was called upon, in the present case, to pass upon the character, powers, and rights of the Northern Pacific Railroad Company, it was bound to regard that company as a corporation of the United States, created for national purposes and as a means of interstate commerce, and not to apply to it the views of the Wisconsin courts pertaining to their local railroads.

Upon the principle of these cases it is obvious that the State of Wisconsin, at least after it had given its consent to

the Northern Pacific Railroad Company to enter into its territory and construct its road, and such consent had been acted on, could not, by hostile legislation, hamper and restrict that company in the management and control of its railroad, nor by judicial decisions of its courts transform a corporation formed by national legislation for national purposes and interstate commerce into one of local character, with rights and powers restricted by views of policy applicable to state organizations.

The doctrine, then, of the courts of Wisconsin, that it is not competent for municipalities to donate money or lands or pledge their credit to promote the construction and maintenance of railroads, because the latter are not public in their character, is not applicable to the present case, for the reason that the transaction in question was not the case of a donation or of a pledge of credit requiring the exercise of the taxing power, but was the case of a sale for a valuable and adequate consideration, and for the further reason that the Northern Pacific Railroad Company is a corporation of a public character whose road is a highway and post road for national uses and to subserve interstate commerce, and, therefore, not within the scope and reason of the decisions relied on by the plaintiffs in error.

But it is further contended, on behalf of the plaintiffs in error, that whether the transaction between the county and the company was that of a sale for a sufficient consideration, or whether the Northern Pacific Railroad Company is a corporation invested with powers of a national origin and subjected to duties of a national character, were not questions open for consideration in the court below, because of the case of *Ellis* v. *Northern Pacific Railroad*, 77 Wisconsin, 114, 118.

That was a case wherein J. F. Ellis, one of the plaintiffs in error in the present case, had filed a bill of complaint against the Northern Pacific Railroad Company in a Circuit Court of the State of Wisconsin, seeking to quiet his title to certain lots of land. These lots had been conveyed to Ellis by Roberts, who claimed to have purchased them from the county

of Douglas, and were some of the lots sold and conveyed by that county to the Northern Pacific Railroad Company, but were not lots included in the present controversy. The railroad company demurred to the complaint; the Circuit Court overruled the demurrer; from the order so overruling the demurrer an appeal was taken to the Supreme Court of Wisconsin; and that court on May 20, 1890, affirmed the order of the Circuit Court, and remanded the cause for further proceedings. In its opinion the court said: "There is nothing to distinguish this case, or to take it out of the decision in the *Whiting case;* for if the county could not donate money or securities to a railroad corporation it could not give its lands, which are the property of the county."

It is observable that the court's attention does not seem to have been drawn to those facts which are calculated to justify a finding that the transaction was a sale on consideration, and not a donation, nor to the real character of the Northern Pacific Railroad Company as a national organization, and thus distinguished from a local railroad company, which was dealt with by the Wisconsin courts in the *Whiting case.* This inattention by the Supreme Court of Wisconsin to such important particulars was probably occasioned by the fact that the case was before them on a demurrer by the company to the complaint of Ellis. It is further to be observed that no final judgment was entered by the Supreme Court of the State, but the cause was remanded to the court below for further proceedings.

Afterwards, and before the final hearing in the state circuit court, the present suit of the Northern Pacific Railroad Company against Roberts and Ellis came to a hearing, and resulted in the decree complained of in this appeal.

The record discloses that in their answer to the company's bill Roberts and Ellis alleged that Ellis had brought an action in the circuit court of Douglas County against the railroad company, which was then pending and undetermined in the Supreme Court of Wisconsin, but they did not pray for any delay or withholding of decision to await the result of such case. The cause was put down for hearing upon the bill

and answer on November 18, 1890; on February 11, 1891, a final decree was ordered to be entered in favor of the complainant, according to the prayer of the bill.

The record also discloses that, at a date not distinctly disclosed, Roberts and Ellis filed with the clerk a supplemental answer, setting up the decision of the Supreme Court of Wisconsin, affirming the order of the circuit court overruling the demurrer to Ellis's complaint as a judgment in bar of the right of the Northern Pacific Railroad Company to proceed in its suit in the Circuit Court of the United States, and claiming that as to the questions so decided by the state courts they became and were by said judgment *res judicata*. The right to file this supplemental answer was not granted by the court, nor was it adverted to in its opinion.

Error could scarcely be imputed to a court for refusing to allow an amendment or supplement to an answer after the case had progressed to a final hearing, nor to its judgment in disregarding the allegations of such proposed amendment. But, waiving that suggestion, and regarding the matter set up in the supplementary as if it had been alleged in the original answer, we are unable to see that the decree of the court below ought to have been affected by anything so alleged.

The suit in the Circuit Court of the State was brought by Ellis to quiet title to lots of land which were not in controversy in the Federal courts, nor was Roberts a party therein. While it may be conceded that the decision rendered in the state court was decisive as between Ellis and the railroad company as to the title to the lots there in question, yet the Circuit Court of the United States, whose jurisdiction had been invoked as to other pieces of land, and with other parties involved, could not be expected to suspend its action, or to adopt a conclusion of the state court reached after the case had been submitted on final hearing in the former court.

Nor do we feel bound to accede to the contention that this court ought now to test the correctness of the decree of the court below by applying to it the views of law upon which the state court proceeded in the case before it. As we have seen, the state Supreme Court did not seem to have before it

the question whether the transaction was not really a sale and not a donation. This is shown by the statement made in its opinion. (77 Wisconsin, 118.) " The lands were conveyed by the county in pursuance of this agreement, and *it is said that the transaction was, in effect, but a donation of its property to the company,* to secure the building of the branch of the railroad designated; and the question is, could the board of supervisors of the county dispose of the property of the county in this way by donating it to the railroad company? " Nor, as we have further seen, do the character and functions of the Northern Pacific Railroad Company, as a national highway and instrument of interstate commerce, appear to have been considered. The conclusion in the Supreme Court of Wisconsin seems to have been reached upon the assumption that the county had donated its lands without consideration to a railroad company organized solely under the laws of Wisconsin. It is apparent, therefore, that the question or point actually litigated in the state court was not the same with those before the Federal court, and hence, as the causes of action in the two courts were not the same, the judgment in the state court, while it might determine the controversy between the parties to it as respects the pieces of land there in question, could not be conclusive in another action upon a different claim or demand. This distinction was clearly recognized in the case of *Cromwell* v. *County of Sac*, 94 U. S. 351, 352. That was a case where there was brought into question the effect, as between the same parties, of a former judgment holding invalid coupons taken from the same bond with those in a second suit, and it was there said : " In considering the operation of this judgment it should be borne in mind that there is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a different claim or cause of action. In the former case the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to

every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose. Thus, for example, a judgment rendered upon a promissory note is conclusive as to the validity of the instrument and of the amount due upon it, although it be subsequently alleged that perfect defences actually existed, of which no proof was offered, such as forgery, want of consideration, or payment. If such defences were not presented in the action and established by competent evidence, the subsequent allegation of their existence is of no legal consequence. The judgment is as conclusive so far as future proceedings at law are concerned, as though the defences never existed. The language, therefore, which is so often used, that a judgment estops, not only as to every ground of recovery or defence actually presented in the action, but also as to every ground which might have been presented, is strictly accurate, when applied to the demand or claim in controversy. Such demand or claim, having passed into judgment, cannot again be brought into litigation between the parties in proceedings at law upon any ground whatever.

" But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not as to what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action. The difference in the operation of a judgment in the two classes of judgments mentioned is seen through all the leading adjudications upon the doctrine of estoppel. . . . The cases usually cited in support of the doctrine that the determination of a question directly involved in one action is conclusive as to that question in a second suit between the

same parties upon a different cause of action, negative the proposition that the estoppel can extend beyond the point actually litigated and determined. . . . It is not believed that there are any cases going to the extent that because in the prior action a different question from that actually determined might have arisen and been litigated, therefore such possible question is to be considered as excluded from consideration in a second action between the same parties on a different demand, although loose remarks looking in that direction may be found in some opinions. On principle, a point not in litigation in one action cannot be received as conclusively settled in any subsequent action upon a different cause, because it might have been determined in the first action. Various considerations, other than the actual merits, may govern a party in bringing forward grounds of recovery or defence in one action, which may not exist in another action upon a different demand, such as the smallness of the amount or the value of the property in controversy, the difficulty of obtaining the necessary evidence, the expense of the litigation, and his own situation at the time. A party acting upon considerations like these ought not to be precluded from contesting in a subsequent action other demands arising out of the same transaction."

It was accordingly held in that case that a party plaintiff who had been defeated in one action upon coupons cut from county bonds because he failed to show that he was a *bona fide* holder for value, was not precluded from showing, in a subsequent action brought to recover on other coupons cut from the same bonds, that he was such *bona fide* holder for value of such other coupons. Under this contention the plaintiffs in error cite *Johnson Co.* v. *Wharton*, 152 U. S. 252, but it is not inconsistent with *Cromwell* v. *County of Sac*, which, indeed, is approved and cited at length.

Error is likewise assigned to the decree because the bill of complaint was multifarious. This assignment is sufficiently disposed of by a reference to *Gaines* v. *Chew*, 2 How. 619, 642, and the cases therein cited.

It is further argued that the court below erred in sustaining a bill in equity for the title to land of which the complainant

was not in possession. The bill avers that the railroad company was in possession of the lots and tracts of land described in the bill. The pleas of Roberts and of Ellis deny respectively that the company was in possession of the several pieces of land claimed by them, but they do not deny that the company was in possession of the lots claimed by Johnson, the co-defendant, and they made the following averment in their answer: "That none of the lots or tracts of land mentioned and described in said bill of complaint were at the time of the commencement of this action or at any time prior or subsequent thereto occupied by, or in the possession of, the complainant, except that the roadbed of its said railroad crosses the following-described tracts, that is to say, lots 217, 339, etc., [Here follows an enumeration of some twenty-five tracts] — that part of said tracts so crossed by said road, as well as the whole of the other tracts of land mentioned and described in complainant's bill, are vacant and unoccupied, and have so remained for more than ten years last past."

It was therefore conceded that the complainant was in actual possession of a portion of the lands, and that the defendants were not in possession of the balance, which are stated to be vacant and unoccupied. An actual possession of a part and a constructive possession of the rest would clearly bring the complainant's case within the remedy provided by the statute of Wisconsin, (§ 3186 Rev. Stat. 1878,) that any person having possession and legal title to lands may institute an action against another person setting up a claim thereto to quiet the title thereto. And in *Chapman* v. *Brewer*, 114 U. S. 170, we held, following previous cases, that, in such a case, a Circuit Court of the United States, having otherwise jurisdiction in the case, will administer the same relief in equity which the state courts can grant. Nor would the complainant, in the present case, have any remedy at law, on the defendants' admission that the lands are vacant and that they are not in possession of them. *Holland* v. *Challen*, 110 U. S. 15; *Whitehead* v. *Shattuck*, 138 U. S. 146.

Upon the whole we are of opinion that the court below committed no error, and its decree is accordingly. *Affirmed.*