MIOCENE DITCH CO. v. JACOBSEN et al.

(Circuit Court of Appeals, Ninth Circuit. June 19, 1906.)

No. 1,304.

1. WATERS AND WATER COURSES—RIGHT OF WAY FOR DITCH IN PUBLIC LANDS —ACQUISITION—PRIORITY OF RIGHT.

Where complainant appropriated certain water rights and began the construction of a ditch, flume, and pipe line in 1901, its right to acquire a right of way over certain mining claims located in 1902 was not affected by the fact that the ditch was not completed over such located ground until after such location, provided proper diligence was used in constructing the ditch.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Waters and Water Courses, § 17.]

2. EMINENT DOMAIN—PUBLIC USE—STATUTES.

Under Alaska Code, c. 22, § 204 (31 Stat. 522), declaring that the right of eminent domain may be exercised in behalf of the following public uses. to wit, canals, ditches, flumes, aqueducts, and pipes for public transportation, supplying mines and farming neighborhoods with water, and for roads, tunnels, ditches, flumes, pipes, and dumping places for working mines, a corporation organized for the purpose of working mines and maintaining an artificial waterway had power to condemn a right of way for the purpose of carrying water to work mining claims owned by it, claims owned by others, and for private and public uses.

[Ed. Note.—For cases in point, see vol. 18, Cent. Dig. Eminent Domain, § 75.]

3. SAME—FAILURE TO CONDEMN—CONSTRUCTION BY LANDOWNER.

Where a corporation entitled to condemn a right of way over defendants' mining claim for a water ditch or flume constructed the ditch over defendants' land without instituting condemnation proceedings, or paying damages for such right of way without objection or protest on defendants' part for a period of two years, and defendants thereafter refused to sell a right of way, but offered to sell their entire claims, they were not authorized to treat the construction of the ditch as a trespass, and destroy the same in the ordinary course of their mining operations.

4. INJUNCTION—PROTECTION OF PROPERTY—PERMANENT INJURY.

Where complainants constructed a water ditch or flume across defendants' mining claims without objection, and without condemning the right of way to which they were entitled, defendants being only entitled to damages for the construction of such ditch, complainants were entitled to an injunction restraining defendants from continuing to destroy the same pendente lite in the course of defendants' mining operations.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, § 102.]

Appeal from the District Court of the United States for the Second Division of the District of Alaska.

This is an appeal from an order dissolving a temporary restraining order, and refusing to grant an injunction pendente lite. The suit was commenced

September 18. 1905. The complaint, among other things, alleges, in substance, that plaintiff was and had been since February 27, 1902, a California corporation, doing business in Alaska, and had complied with all the laws of the United States relating to foreign corporations doing business in Alaska; that by its charter "plaintiff was and is authorized and empowered, among other things, to own and operate mines and mining claims within the district of Alaska, to own and appropriate water and water rights for private and public use, and to build canals, ditches, flumes, and aqueducts, and to lay pipes for supplying its mines with water, and for the general use of the public in the district of Alaska"; that since June, 1902, it had been continuously engaged in said business, and was at the times mentioned in the complaint "the owner of, in the possession of, and entitled to the possession of, a ditch, flume, and pipe line extending from Nome river to Anvil creek, in the Cape Nome precinct, district of Alaska; that the construction of said ditch, flume, and pipe line was commenced in the year 1901 by plaintiff's grantors, and completed by plaintiff in the year 1903"; that the capacity of said ditch from Nome river to Hobson creek was 2,100 miners' inches of water, and from Hobson creek to Anvil creek 5,000 miners' inches, and the construction cost, including laterals and pipes, exceeded $350,000; that since said ditch was completed in 1903 plaintiff had continuously used all the available waters of Nome river to the full capacity of said flume and pipe line from the intake on Nome river, some 30 miles, to Anvil, Glacier, and Dexter creeks and vicinity, where the water was used partly in working placer mining claims owned and leased by plaintiff, and partly farmed out for hire to be used by other persons, corporations, and the public generally for mining purposes; that on September 11, 1905, "the defendants, their servants, agents, and employés, wrongfully and unlawfully, at a point on plaintiff's ditch between Divide creek and Dorothy creek, both tributary to Nome river, by means of water under pressure above plaintiff's ditch, washed out, broke, and destroyed plaintiff's said ditch, without any right whatever upon the part of the defendants so to do"; that plaintiff repaired its said ditch, and commenced again to use the same, and that defendants threatened to again destroy it at the same and other points; that the use of the water in said ditch at the points where the same was destroyed was $5,000 per day, and if interfered with plaintiff would be damaged $5,000 per day; that said damage was irreparable and a continuing one, and the defendants were insolvent; that the plaintiff had no plain, speedy, or adequate remedy except by injunction, enjoining the alleged wrongful acts of defendants.

The complaint also contained the following additional averments: "That the climatic and other conditions in and around that portion of the district of Alaska wherein plaintiff's ditch, flume, and pipe line is situated are such that the lands therein lying are valuable only for mining, and are useful for no other purpose whatsoever, and mining is the one, sole, exclusive, and only productive industry in and around the aforesaid portion of the district of Alaska; that the aforesaid ditch, flume, and pipe line of plaintiff is the only available one for conducting the said waters of Nome river to the mining localities aforesaid, and many of the mines in said locality owned and operated by plaintiff and the public generally are entirely dependent upon said source of water supply, and without the same would become utterly worthless and unprofitable as mining claims; that plaintiff is under contract for the furnishing of water from its said ditch, flume, and pipe line to numerous consumers, and will render itself liable in damages to said consumers if prevented from obtaining a supply of water from Nome river through its said ditch, and will also be prevented from working, sluicing, and hydraulicing the placer mining claims owned and leased by said plaintiff."

Upon the filing of said complaint, accompanied by affidavits supporting its allegations, the court issued an order for the defendants to show cause why an injunction pending the determination of the action should not be granted, and in the meantime the defendants were enjoined from interfering with said ditch. No answer was filed to the complaint. A hearing was had upon affidavits and depositions of the respective parties, and upon such hearing the court dissolved the temporary restraining order, and refused to issue an order of injunction pendente lite. Only three of the mining claims which defendants

owned were located in the month of March, 1902, the other claim, the Moonshine, was not located until after the completion of the plaintiff's ditch. Other facts are stated in the opinion.

The statute of Alaska, which is referred to in the opinion, reads as follows: "The right of eminent domain may be exercised in behalf of the following public uses * * * canals, ditches, flumes, aqueducts, and pipes for public transportation, supplying mines and farming neighborhoods with water. * * * (5) Roads, tunnels, ditches, flumes, pipes, and dumping places for working mines." 31 Stat. p. 522, c. 22, § 204.

W. H. Metson and Ira D. Orton (Charles S. Wheeler, of counsel), for appellant.

P. C. Sullivan (W. A. Gilmore, of counsel), for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after making the foregoing statement, delivered the opinion of the court.

Did the court err in dissolving the temporary restraining order and in refusing to grant an injunction pendente lite? It is admitted that the preliminary order in the first instance was properly issued; that a clear prima facie case was established by the complaint and affidavits filed in support thereof. The rule to show cause why it should be dissolved was heard upon the complaint, and upon affidavits and depositions offered by the respective parties.

It is contended by the appellees that upon the facts presented at the hearing it affirmatively appears that the appellant constructed its ditch over the mining claims owned by appellees without proceedings had to condemn the right of way for a ditch over said claims, without agreement, license, or other legal right, and that appellant's entry upon and use of appellees' property being wrongful, appellant was a trespasser upon appellees' domain. The court below sustained this view, and further held upon the facts that appellees were the owners of valuable mining claims which were trespassed upon by appellant; that the injuries of which appellant complains were committed by the appellees while "in the usual and ordinary course of their mining operations, and upon the land owned by some of them," and that they, being prior in point of time, were prior in right, and dissolved the restraining order.

It will be observed from the statement of facts that the location of the mining claims was made March 21, 1902, and that the construction of the ditch, flume, and pipe line of appellant was commenced in 1901 and completed in the year 1903. The rights acquired by appellant did not depend upon the completion of the ditch, if proper diligence was used in its construction.

In Osgood v. El Dorado W. & G. Co., 56 Cal. 573, 581, the court, in construing the act of Congress of July 26, 1866, c. 262 (14 Stat. 251), relative to the prior appropriation of water on the public land, and the amendatory act of July 9, 1870, c. 235 (16 Stat. 217), said:

"The defendants' grantors, therefore, had the right to appropriate the water in controversy, and if they acquired a vested right therein prior to the issuance of the plaintiff's patent, the plaintiff's rights, by express statutory enactment, are subject to the rights of the defendant. This, of course,

depends on the question whether the grantors of the defendant made a valid appropriation of the water, and this, in turn, on the question whether they gave proper notice of their intention to appropriate it, and, if so, whether they prosecuted the work in that behalf with reasonable diligence. If they gave sufficient notice, and prosecuted the work with reasonable diligence, there can be no doubt that, on the completion of the work, their rights related back at least to the commencement of the work."

In Flint & P. M. Ry. Co. v. Gordon, 41 Mich. 420, 430, 2 N. W. 618 (a controversy as to the right of way for a railroad and the rights of a homestead entryman), the court said:

"The homestead entry vested no title in the defendant, but it gave to him under the law a right of possession which he might perfect by continued occupancy and improvement. If he failed so to perfect it, what right he had reverted to the United States. If he perfected it, he was entitled to a patent, which related back to the time when his entry was made, and took date with it. French v. Spencer, 21 How. 228, 16 L. Ed. 97; Shepley v. Cowan, 91 U. S. 337, 23 L. Ed. 424; Johnson v. Ballou, 28 Mich. 379. * * * But in this case there is what seems at first blush to be a conflict of grants. The defendant made his entry first, but the complainant completed its road over the land before the defendant obtained his patent. To acquire the benefit tendered by the act of 1866, nothing more was necessary than for the road to be constructed. No patent is required in such cases, but the offer and the acceptance, taken together, are equivalent to a grant. The complainant, therefore, by accepting the offer of the government, obtained a grant of the right of way, which was at least perfectly good as against the government, and must be held to be perfectly good as against this defendant unless his patent antedates it by relation, or unless the equities springing from his possession and improvement would preclude any right being acquired adversely."

These general principles are well settled. It may be that the record does not present this question sufficiently to have it determined, but, so far as the record goes, it tends to show that the appellant was prior in time and prior in right. We have simply referred to this matter for the purpose of directing attention to the fact that it was overlooked by the court below, and that the court proceeded upon an erroneous theory of the case.

Can appellant sustain its right to an injunction; it being shown that no proceedings were instituted by it to condemn the right of way for its ditch? Appellees claim that appellant could not condemn the land for the purpose of working other mining claims owned by it, and for working mining claims owned by others, because it was but an individual private use, and was not for a public use.

The decision of this court in Miocene Ditch Co. v. Lyng (C. C. A.) 138 Fed. 544, 548, fully sustains the proposition that appellant could have exercised the right of eminent domain, and condemned the right of way over the land claimed by appellees. The court in that case, after stating that "the right of eminent domain can only be exercised in behalf of a public use authorized by law, and in the taking of property necessary to such public use the complaint or petition in such proceedings must show plainly and affirmatively the existence of the statutory authority for the public use, and the necessity of the property for such use," and after reviewing the authorities, and holding that the complaint was defective in not "showing a public need for the proposed ditch," said:

"Now, it may be made to appear that this ditch was for a public use, as has been attempted in the complaint; and, if this public use is made to clearly appear, does it not follow that the plaintiff is entitled to exercise the right of eminent domain under the statute? We think this is the intent and fair construction of the statute, and that the demurrer on this ground should have been overruled,"

—and leave was granted to amend the complaint in this particular.

The complaint in the present case clearly shows that the ditch was constructed for a public use. We think that under the provisions of the Alaska Code, which we have copied, the appellant had the unquestioned right in the first instance to condemn the land.

In Clark v. Nash, 198 U. S. 361, 367, 25 Sup. Ct. 676, 49 L. Ed. 1085, which was rendered subsequently to the decision of this court in Miocene Ditch Co. v. Lyng, supra, the court had occasion to discuss the question of the right of eminent domain under the provisions of the Utah statute, which in all essential respects is similar in its provisions to the Code of Alaska. See Nash v. Clark, 27 Utah, 159, 75 Pac. 371, 1 L. R. A. (N. S.) 208, 101 Am. St. Rep. 953. Upon this subject the court said:

"The plaintiffs in error contend that the proposed use of the enlarged ditch across their land for the purpose of conveying water to the land of the defendant in error alone is not a public use, and that, therefore, the defendant in error has no constitutional or other right to condemn the land, or any portion of it, belonging to the plaintiffs in error, for that purpose. They argue that, although the use of water in the state of Utah for the purpose of mining or irrigation or manufacturing may be a public use where the right to use it is common to the public, yet that no individual has the right to condemn land for the purpose of conveying water in ditches across his neighbor's land, for the purpose of irrigating his own land alone, even where there is, as in this case, a state statute permitting it. In some states—probably in most of them—the proposition contended for by the plaintiffs in error would be sound. But whether a statute of a state permitting condemnation by an individual for the purpose of obtaining water for his land or for mining should be held to be a condemnation for a public use, and therefore a valid enactment, may depend upon a number of considerations relating to the situation of the state and its possibilities for land cultivation, or the successful prosecution of its mining or other industries. Where the use is asserted to be public, and the right of the individual to condemn land for the purpose of exercising such use is founded upon or is the result of some peculiar condition of the soil or climate, or other peculiarity of the state, where the right of condemnation is asserted under a state statute, we are always, where it can fairly be done, strongly inclined to hold with the state courts when they uphold a state statute providing for such condemnation. The validity of such statutes may sometimes depend upon many different facts, the existence of which would make a public use, even by an individual, where, in the absence of such facts, the use would clearly be private. Those facts must be general, notorious, and acknowledged in the state, and the state courts may be assumed to be exceptionally familiar with them. They are not the subject of judicial investigation as to their existence, but the local courts know and appreciate them. They understand the situation which led to the demand for the enactment of the statute, and they also appreciate the results upon the growth and prosperity of the state, which in all probability would flow from a denial of its validity. These are matters which might properly be held to have a material bearing upon the question whether the individual use proposed might not in fact be a public one."

See, also, Strickley v. The Highland Boy Gold Min. Co. (Feb. 19, 1906) 200 U. S. 527, 26 Sup. Ct. 301, 50 L. Ed. 581; The Otis

Co. v. The Ludlow Mfg. Co. (March 12, 1906) 201 U. S. 140, 26 Sup. Ct. 353, 50 L. Ed. 696; Oury v. Goodwin, 3 Ariz. 255, 26 Pac. 376; Ellinghouse v. Taylor, 19 Mont. 462, 48 Pac. 757; Dalles Lumber Co. v. Urquhart, 16 Or. 67, 19 Pac. 78; Lewis County v. Gordon, 20 Wash. 80, 54 Pac. 779; Nash. v. Clark, 27 Utah, 158, 75 Pac. 371, 1 L. R. A. (N. S.) 208, 101 Am. St. Rep. 953; Dayton, G. & S. M. Co. v. Seawell, 11 Nev. 394; Kansas & Texas Coal Ry. Co. v. N. W. C. & M. Co., 161 Mo. 289, 310, 61 S. W. 684, 51 L. R. A. 936, 84 Am. St. Rep. 717.

Were appellees justified, upon the ground that appellant had not instituted proceedings prior to completing its ditch across and over their mining claims, two years after the ditch had been completed over their land, without objection or protest on their part, by means of water under pressure above appellant's ditch, after dark, without lights or sluices upon their mining claims, wash out, break, and destroy said ditch "in the usual and ordinary course of their mining operations?" As was said by appellee Jacobsen:

"We turned on the water about a hundred and twenty-five feet above the ditch, through a pipe—probably five hundred inches of water, maybe more and maybe less—for to sluice the top of the muck off, as it was necessary for us to do so. and we cut across the ditch. as the pay lies right under the ditch."

Waiving, for the present, at least, the conflicting testimony as to whether or not the ground of the appellees consisted of valuable mining claims, we proceed to consider the undisputed questions of fact as shown by the record.

The affidavits on the part of appellant were clear and direct upon the point that no objections were made to the construction of the ditch over the land in question. There was no evidence on the part of the appellees that they made any objections at that time. Appellee Spullis testified that he was on the ground in September, 1903:

"Q. Was the Miocene building their ditch there then? A. Yes. Q. You saw them there, building their ditch? A. I did. Q. Make any objections to it? A. I did not."

Appellee Jacobsen was on the ground in the fall of 1903 and winter of 1903–04, but did not testify that he ever made any objection to the construction of the ditch. May and Kemter were never on the claims at any time, and never made any objections to the building of the ditch. It is true that appellee May, on August 31, 1904, after the completion of the ditch, served upon appellant the following notice:

"Nome, Alaska, August 31, 1904.

"To the Miocene Ditch Company and J. M. Davidson, President of Said Company—Gentlemen: You will please take notice that I intend to mine by hydraulic and ground sluicing process my placer mining ground upon which your ditch crosses just above Discovery gulch, a tributary of Nome river. It is my intention to crosscut our claims and benches on and above said gulch, and you are hereby notified that unless you pipe or flume your water across said ground immediately that we will not be responsible for any damages that may result to your ditch on any of our ground where we hydraulic or ground sluice from the water above."

A short time before the injury complained of by appellant was committed, appellees Jacobsen and Chognon were working on their claims, and claimed that appellant's ditch had overflowed its banks, discharging water upon them and damaging them, and upon demand this claim was settled, and the following receipt given:

"Nome. Alaska, Aug. 2, 1905.

"Received from Miocene Ditch Co. four hundred and six 00/100 dollars, being payment in full for all damage and causes of action whatsoever to date.
"$406.00/100.                                     John Jacobsen.
                                                 "A. B. Chognon."

At the time this receipt was given, no objection was made to the existence of the ditch over their ground. After the injury to the ditch, and after it was repaired, and while appellees were openly threatening to again wash it out and destroy it, claiming that they had the right so to do, certain negotiations were had, and appellees said they would not sell a right of way for the ditch, but would sell the entire claims over which the ditch passed for $7,500. In the light of all the facts, is it not manifest that the course pursued by appellees in injuring the ditch and threatening to destroy it was unlawful and without any legal right whatever? Their remedy, if any they had in the premises, would be restricted to the damages for injuries occasioned by reason of the construction of the ditch.

The rules and principles of law upon this subject are well settled.

In Roberts v. Northern P. R. R., 158 U. S. 1, 11, 15 Sup. Ct. 756, 39 L. Ed. 873, the court said:

"It has been frequently held that if a landowner, knowing that a railroad company has entered upon his land and is engaged in constructing its road without having complied with the statute, requiring either payment by agreement or proceedings to condemn, remains inactive, and permits them to go on and expend large sums in the work. he will be estopped from maintaining either trespass or ejectment for the entry, and will be regarded as having acquiesced therein, and he restricted to a suit for damages,"—

—citing many authorities.

This same doctrine was announced in Northern P. R. R. Co. v. Smith, 171 U. S. 260, 275, 18 Sup. Ct. 794, 43 L. Ed. 157; United States v. Lynah, 188 U. S. 445. 467, 23 Sup. Ct. 349, 47 L. Ed. 539; Maffet v. Quine (C. C.) 93 Fed. 347, 349; Cowley v. City of Spokane (C. C.) 99 Fed. 840, 843; Sherlock v. Railway Co., 115 Ind. 22, 30, 17 N. E. 171.

In Maffet v. Quine, supra, it was declared by the court that the construction of a flume to convey lumber from mills to a city is a work of such a public character as will authorize the condemnation of right of way therefor under the statutes of Oregon. The facts of the case were that the defendant therein had acquired the ownership of land over which the flume had previously been constructed by a mill company, and continued to reside upon it for a number of years, without making any objections to the maintenance of the flume, until he sought to collect a claim from the mill company for wages. The court held that the company was entitled to a prelimi-

nary injunction to restrain him from committing a threatened injury to the flume.

There are numerous state authorities cited in the decisions of the Supreme Court to which we have referred that announce the same general principles. A ditch of the character of the one in question bears a close analogy to a railroad, dependent, as each is, upon its right to protect its entire line without the breaking of any links along its general course. There are many cases where the right of condemnation has been granted and judgment rendered for the damages without payment until after possession has been taken of the property condemned, where the same principles above enunciated have been applied.

In McAulay v. Western V. R. R. Co., 33 Vt. 311, 321, 78 Am. Dec. 627, which was an action of ejectment, it was held that payment of damages is a condition precedent to the acquiring of title by a railroad company of lands taken by condemnation for their road; but it was also held that such a condition was for the benefit of the landowner, and might be waived by him even by parol. It was admitted that the landowner had full knowledge of the proceedings of the railroad company to locate and construct its road upon the land before and during all the time of the construction, and that he did not interfere in any way to prevent the occupation of the land for the purposes of the road otherwise than by forbidding the men employed to work thereon until the damages were paid. The question was whether the landowner could, upon the facts, maintain an action of ejectment for the land. In the course of the opinion the court said:

"In these great public works the shortest period of clear acquiescence, so as fairly to lead the company to infer that the party intends to waive his claim for present payment, will be held to conclude the right to assert the claim in any such form as to stop the company in the progress of their works, and especially to stop the running of the road after it has been put in operation, whereby the public acquire important interests in its continuance."

In Dodd v. St. Louis & H. Ry. Co., 108 Mo. 581, 585, 18 S. W. 1117, the court said:

"It is equally well settled that a party who with full knowledge stands by and permits a company to expend large sums of money in the construction of a railroad through his land without objection forfeits his right of ejectment. [Citing cases.] This right is forfeited by virtue of the application of the doctrine of estoppel, as well as the intervention of public interests. Property in a railway is peculiar. A railway may be likened to a chain, which is worthless with one link out. The ejectment of the company from a mile or half a mile of its track almost wholly destroys the value of the entire line. The landowner knows this, and when he stands by and sees large sums of money expended on his land, and probably millions expended in the construction of the whole road, and interposes no objection, every consideration of justice and fair dealing requires that he should not be permitted to destroy such vast interests by wresting possession of a part of the road from the company, and thus severing its connections. * * * In such case we can pertinently say that he who will not speak when he should ought not to be permitted to speak when he would."

We recognize the full force and effect of the rule announced by the courts that the granting or refusing an injunction is largely

within the sound discretion of the court, and ought not ordinarily be reversed upon appeal; but if the principles of law have been departed from, the appellate courts should never hesitate to act. Certain principles in this connection are well settled.

In Allison v. Corson, 88 Fed. 581, 584, 32 C. C. A. 12, the court below refused to grant a temporary restraining order, and upon appeal its action was reversed. The court said:

"The controlling reason for the existence of the right to issue a temporary injunction is that the court may thereby prevent such a change of the conditions and relations of persons and property during a litigation as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated. Undoubtedly, an injunction ought not to be issued unless substantial questions of law or fact, whose decision in favor of the moving party would entitle him to ultimate relief, are presented. If it is reasonably clear that he cannot ultimately succeed—if his pleading discloses no cause of action or defense—no injunction should be granted. But if the questions to be ultimately settled are serious and doubtful, and if the injury to the moving party will be certain, great, and irreparable if the motion is denied and the final decision is in his favor, while if the decision is otherwise the inconvenience and loss to the opposing party will be inconsiderable, and may well be indemnified by a proper bond, if the injunction is granted, it is the duty of the chancellor to issue it. A preliminary injunction, maintaining the status quo, may properly issue whenever the questions of law or fact to be ultimately determined in a suit are grave and difficult, and injury to the moving party will be immediate, certain, and great if it is denied, while the loss or inconvenience to the opposing party will be comparatively small and insignificant if it is granted."

In addition to the authorities there cited, see Cartersville L. & P. Co. v. Mayor (C. C.) 114 Fed. 699; Denver & R. G. Co. v. United States, 124 Fed. 156, 161, 59 C. C. A. 579; Harriman v. Northern Securities Co. (C. C.) 132 Fed. 464; Hoy v. Altoona Midway Oil Co. (C. C.) 136 Fed. 483, 484, and numerous authorities there cited.

The order of the District Court dissolving the temporary restraining order, and refusing to grant the injunction pendente lite, is overruled.