DALTON et al. v. KATALLA CO. et al.

(Third Division. Valdez. October 16, 1911.)

No. 398.

1. JUDGMENT (§ 743*)—CONCLUSIVENESS—TITLE TO LAND.

    Suit was brought to enjoin defendant from maintaining a wharf on the tideland in front of plaintiff's upland. A judgment of the court between the same parties in a former case over the title to the same land was admitted in evidence as determining the question of ownership of the upland.

    [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1252, 1253, 1275–1277, 1284; Dec. Dig. § 743.*]

2. NAVIGABLE WATERS (§ 37*)—TIDELANDS—RAILROADS—RIGHT OF WAY—WHARVES.

    Under Act Cong. May 14, 1898, c. 299, 30 Stat. 409, a railroad has a grant of easement over tidelands in Alaska for the

---

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

erection of necessary approaches, piers, and wharves in forming a connection with navigable waters.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

3. ESTOPPEL (§ 93*)—ACQUIESCENCE IN IMPROVEMENTS—RAILROADS —NAVIGABLE WATER.

Where the owner of upland bordering on navigable waters in Alaska stands by and permits a railroad company to build its approaches, piers, and wharves on tidelands in front of his upland without protest, and under the act of Congress authorizing it, he is estopped from having a mandatory injunction requiring the railroad company to remove them, and is restricted to his suit for damages.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 264–275; Dec. Dig. § 93.*]

4. NAVIGABLE WATERS (§ 39*)—RIGHT OF UPLAND OWNER TO ACCESS—DAMAGES.

The general rule is that an upland owner may have a right of action against an intruder who places obstacles on the shore that prevents him from having access to the navigable waters; but such rights may be lost when he permits a railroad company to build approaches, piers, and wharves in front of his upland without prompt appeal to the courts to prevent it, and in such case he cannot have a mandatory injunction to remove the structures, but must resort to a suit for damages.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 21, 53, 82, 103, 112, 117, 127, 239–244; Dec. Dig. § 39.*]

5. INJUNCTION (§ 5*)—MANDATORY INJUNCTION.

Mandatory injunction will not issue to compel a railroad company to remove approaches, piers, and wharves erected on tidelands in front of an upland owner's property, who stood by and saw them built without applying promptly for injunctive relief. He is estopped by his nonaction and acquiescence, and must look to a suit for damages for relief.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 4; Dec. Dig. § 5.*]

This is an action in equity, seeking a mandatory injunction against the defendants, restraining them from maintaining certain trestles and wharf on the shores of Orca Inlet, an arm of Prince William Sound, in front of plaintiffs' upland holdings.

Malony & Cobb, of Juneau, for plaintiffs.
R. J. Boryer, of Cordova, for defendants.

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

LYONS, District Judge.  To sustain their claim to the mining claims described in the second amended complaint, the plaintiffs offered in evidence findings of fact, conclusions of law, and judgment in cause No. 267, Consolidated, Al Lowe and Jennie Dalton v. Katalla Company, which findings of fact, conclusions of law, and judgment were entered by this court on the 29th day of May, 1911, and which said judgment decrees that plaintiffs herein are the owners of said mining claims, and the whole thereof, as against the defendants in that action.  Said judgment has not been modified or set aside, so far as the record in this case discloses, and has not been appealed from.  Such judgment is therefore binding on this court, as to the matters determined therein, in the trial of this action.

But the defendants contend that, even conceding the plaintiffs are the owners of the mining claims described in the secod amended complaint, they cannot maintain this action for the reasons: First, that they knew of the construction of the railroad, trestles, wharves, and warehouses by the defendants at the time they were in course of erection, and made no protest whatever against the same, and that plaintiffs are therefore now estopped from complaining of the existence of said railroad, trestles, wharves, and warehouses in front of their property; second, that the trestles, wharves, and warehouses complained of do not substantially interfere with plaintiffs' right of access from said mining claims to the navigable waters of Orca Inlet.

It appears from the evidence that, pursuant to an act of Congress, approved May 14, 1898, entitled "An act extending the homestead laws and providing for right of way for railroads in the district of Alaska, and for other purposes," during the winter of 1905–06, M. J. Keney, for and on behalf of the Copper River Railway Company, made a preliminary survey for a railroad from a point on Orca Inlet to the Copper river, which point is designated in plaintiffs' second amended complaint as Three Tree point, for the purpose of constructing a railroad from the navigable waters of Orca Inlet up the Copper river into the interior of Alaska; that the maps and

plats of said preliminary survey were filed with the local Land Office of the United States for the purpose of initiating and acquiring said right of way, on the 19th day of February, 1906, and that said survey was thereafter approved by the Land Department of the United States; that, after said survey was made and approved as aforesaid, said Keney, acting for and on behalf of the Copper River Railway Company, began the construction of said railroad on the line of said survey from the navigable waters of Orca Inlet up the Copper river toward the interior of Alaska, and during the summer, fall, and winter of 1906 constructed and erected a portion of the wharf, piling, trestles, and warehouses complained of in plaintiffs' second amended complaint; that thereafter, and before any protest was made by the plaintiffs herein against the erection of such trestles, wharf, and warehouses, the said Copper River Railway Company transferred all of its right, title, and interest in and to said right of way, railroad, trestles, wharves, and warehouses to the defendants herein. It further appears from the evidence that, while said trestles, wharves, and warehouses were not constructed under the supervision of the Secretary of the Treasury, yet in the year 1909 both the Secretary of the Treasury and the Secretary of War of the United States approved the construction and erection of said wharves, trestles, and piling. Section 2 of the act of May, 1898, supra, among other things, provides:

"And when such railway shall connect with any navigable stream or tide water such company shall have power to construct and maintain necessary piers and wharves for connection with water transportation, subject to the supervision of the Secretary of the Treasury: Provided, that nothing in this act contained shall be construed as impairing in any degree the title of any state that may hereafter be erected out of said district, or any part thereof, to tidelands and beds of any of its navigable waters, or the right of such state to regulate the use thereof, nor the right of the United States to resume possession of such lands, it being declared that all such rights shall continue to be held by the United States in trust for the people of any state or states which may hereafter be erected out of said district."

It is apparent that under and by virtue of said act the defendants were empowered to build whatever piers, docks, and

wharves were necessary to connect their railroad with the navigable waters of Alaska, provided such structures should not interfere with navigation or the rights of the public; and while the act provides that nothing therein contained shall be construed as impairing in any degree the title of any state that may hereafter be erected out of said district, or any part thereof, to the tidelands and beds of any of its navigable waters or the right of such state to regulate the use thereof, it nevertheless does grant to any railroad corporation such an easement over such tidelands as is necessary to enable such corporation to connect its railroad with water transportation facilities. In re Prosser v. Northern Pacific Railroad Co., 152 U. S. 59, 14 Sup. Ct. 528, 38 L. Ed. 352, Mr. Justice Gray, in speaking for the court, among other things, said:

"It may be admitted that the Congress of the United States, while the present state of Washington was a territory, had the power, in chartering a corporation to construct and maintain a railroad from Lake Superior to the Pacific Coast, to grant to the corporation such title or rights in lands below high-water mark of tide waters of the territory as might be necessary or convenient for the building, maintenance, use, and enjoyment of such structures as might be required for commerce and transportation on the railroad and by sea, and transferring goods and passengers between the railroad and sea-going vessels."

In re Heckman v. Sutter, 119 Fed. 83, 55 C. C. A. 635, Mr. Justice Ross, speaking for our appellate court, among other things, said:

"It is well settled that the United States government, while it holds a country as territory, has all the powers of national and municipal government, and may, if it sees fit to do so, grant rights in or title to the tidelands of such territory as well as the public lands above high-water mark."

See, also, Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; Sutter v. Heckman, 1 Alaska, 81; Carroll v. Price (D. C.) 81 Fed. 137; Case v. Toftus (C. C.) 39 Fed. 730, 5 L. R. A. 684; 29 Cyc. 357; Kneeland v. Korter, 40 Wash. 359, 82 Pac. 608, 1 L. R. A. (N. S.) 745.

"The owner of land bounded by a navigable river has certain riparian rights," which "can be taken for the public good only when due compensation is made." Yates v. Milwaukee, 77 U. S. (10

Wall.) 497, 19 L. Ed. 984; Dalton v. Hazelet, 182 Fed. 562, 105 C. C. A. 99.

In this case the evidence shows that the property of the plaintiffs abuts on the navigable waters of Orca Inlet, an arm of Prince William Sound, and, as owners of said upland, they have a right of access from the same to the navigable waters of said Orca Inlet. Therefore the only serious questions involved in this case are: First, are the plaintiffs estopped from asserting at this time a claim in this form of action, that they are entitled to a mandatory injunction restraining the defendants from maintaining the structures complained of in front of their upland, or have they estopped themselves by their silence and acquiescence in the erection of such structures at the expense of the defendants; and, second, what is meant by right of access, and do such structures substantially interfere with the plaintiffs' right of access to deep water navigation?

The plaintiffs to the action did not offer themselves as witnesses, but John Dalton, the brother of the plaintiff Jennie Dalton, was called as a witness and testified that Jennie Dalton held a two-thirds interest in the mining claims described in the second amended complaint in trust for him, and that he and the plaintiff Lowe were the real owners of said upland. In his testimony Mr. Dalton further admitted that he made no protest against the construction of the railroad, trestles, wharves, or warehouses until April, 1908. He also states that up to that time whatever railroad buildings or structures had been constructed in front of his uplands did not interfere with his access to navigable water. In re Roberts v. Northern Pacific Railway Co., 158 U. S. 11, 15 Sup. Ct. 756, 39 L. Ed. 873, Mr. Justice Shiras, speaking for the Supreme Court of the United States in said cause, used the following language:

"So, too, it has been frequently held that if a landowner, knowing that a railroad company has entered upon his land and is engaged in constructing its road without having complied with the statute, requiring either payment by agreement or proceedings to condemn, remains inactive and permits them to go on and expend large sums in the work, he will be estopped from maintaining either trespass or ejectment for the entry, and will be regarded as having acquiesced therein, and be restricted to a suit for damages."

"When the owner contracts with a railroad company to sell to

it a right of way over his land, receives a part of the purchase money in cash, and takes promissory notes for the balance, reserving title to himself until the same are paid, and consents to the placing on the land of railroad track, etc., as a part of a continuous line, an action of ejectment cannot thereafter be maintained by such owner to dispossess the company of the right of way so procured, even if, in such a case, the purchase-money notes remain unpaid, and they become barred by the statute of limitations. This fact is not material in determining the question as to whether the action of ejectment would lie." Atlanta, K. & N. Ry. Co. v. Barker, 105 Ga. 534, 31 S. E. 452; Hendrix v. Southern Railway Co., 130 Ala. 205, 30 South. 596, 89 Am. St. Rep. 27; Louisville, N. A. & C. Railway Co. v. Beck, 119 Ind. 124, 21 N. E. 471; 29 Cyc. 363.

The authorities last cited sustain the doctrine that, if a party permits a railroad company to construct a road across his premises without objection, he cannot thereafter cause such railroad company to be removed in any form of action, but is relegated to an action for damages; and it is also held that even although the railroad company promises to pay the property owner for any damages he may sustain, and after the construction of the road refuses to fulfill such promise, the landowner, whose property is crossed by the railroad company, cannot maintain trespass or ejectment against the railroad company on account of the breach of its contract to pay damages, but such landowner is restricted to an action for damages.

In re Miocene Ditch Co. v. Jacobsen, 146 Fed. 680, 77 C. C. A. 106, our appellate court used the following language:

"Where complainants constructed a water ditch or flume across defendants' mining claims without objection, and without condemning the right of way to which they were entitled, defendants being only entitled to damages for the construction of such ditch, complainants were entitled to an injunction restraining the defendants from continuing to destroy the same pendente lite in the course of defendants' mining operations."

It is obvious, therefore, that the plaintiffs are not entitled to a mandatory injunction against the defendants as to all structures erected in front of their upland prior to April, 1908, the time that the witness Dalton admitted was the first occasion he protested against the maintenance of such structures or the enlargement of the same.

Plaintiffs offered in evidence a map or plat, which is designated Plaintiffs' Exhibit 9, which the witness Dalton testified showed the condition of the railroad, trestles, and wharves in April, 1908, at the time he made the protest against a further extension of the wharves or trestles in front of plaintiffs' holdings. Such exhibit shows a small wharf opposite Three Tree point, and also trestle work leading from the wharf towards the town of Cordova, and it is shown by the evidence that long prior to that time the road had been actually constructed from said wharf along the trestles to the town of Cordova and for several miles on towards the interior of Alaska; but the testimony further shows that other trestles were constructed after the witness Dalton claims to have made such protest, and that the wharf was extended farther in a northerly direction and opposite the west side of the shore line of his upland. But what was the character of Mr. Dalton's protest? In answer to a question, he said:

·"I told Mr. Hawkins he could not come on my ground without acknowledging my rights."

Such an objection is perfectly consistent with the theory that he was willing that the defendants might continue to construct their wharves and trestles, provided they should acknowledge his ownership of the upland and his consequent right to damages for any injury that he might sustain by reason of the erection of such structures. It cannot be said that he is in a better position to invoke the power of a court of equity to cause the removal of such structures by mandatory injunction than one who permits a railroad company to enter upon his premises with the understanding and agreement that such company shall pay him for whatever damages he sustained by the construction of such road across his premises, for in the later case the very fact that the railroad company enters into such a contract is an acknowledgment of his ownership of the premises and his right to enjoin the erection of such structures until it either procures such right from him or secures the same through condemnation proceedings. In re Planet Property & Financial Co. v. St. Louis, O. H. & C. Ry. Co., 115 Mo. 613, 22 S. W. 616, the court, among other things, said:

4 A.R.—27

"The petition does aver, however, that it objected, and notified defendant of its objection, while the road was being built. It seems that equity and fair dealing would have required plaintiff to take some action in order to have prevented the injury complained of, and that it ought not to be permitted to stand by and see the work going on, and large sums of money in and about the same being expended, and after all this has been done, and the road completed and in operation, then come into a court of equity, and ask that the defendant be enjoined and restrained from the operation of its road until it shall have been compensated for the injury to its lands by reason of its construction and operation. An injunction should not be granted under such circumstances. There is no equity in the bill, and the demurrer to the petition was properly sustained."

In the case just cited the parties alleged that the petitioner had protested against the construction of the railroad across its premises, but the court held that the petitioner should do more than merely protest. In this case, however, as before stated, the witness Dalton admits that he protested against the enlargement of the wharf and the construction of sidings, trestles, etc., in front of his property, unless the defendants should acknowledge his rights. In re Atlanta, K. & N. Ry. Co. v. Barker, supra, the court, among other things, said:

"It must be understood that we are not denying the right of the vendor to maintain an action of ejectment to recover land sold by him when, by the contract, he reserved title in himself until the payment of the purchase money, and where the purchase money is due, and he has not been paid. As a general proposition, that is too well settled to require at our hands any consideration. But the question is whether, under the circumstances of this case, the plaintiff in this action had this remedy. In the argument here, counsel for defendant in error insisted that, if this remedy did not exist in this case, it was because the defendant was a railroad company, and he questioned whether a railroad company had any rights superior to those of an individual. Counsel was right. If this action cannot be maintained in the present case, it is because the defendant is a railroad company. Not that a railroad company has or ought to have any more rights than an individual; not because the claims of a railroad company should be entitled to any more consideration than those which any natural person possesses; but it is because a company which has constructed and is operating a railroad between two distant termini, running through several counties, and possibly states, must, for the sake of the public interest involved, be treated as an entirety, and that one cannot stand by and suffer another to expend money to large amounts on his land as part of a great system of improvement, and then stop (by injunction) the entire system until he is paid. He must move in limine. He must de-

fend at the threshold. Laches is a lock to the door of equity, which few keys, if any, are strong enough to open. Griffin v. Railroad Co., 70 Ga. 167. A railroad, with its bridges, depots, and other appurtenances, is no less an entirety than a dwelling house, with its kitchen, its chimneys, and its doorsteps; and yet no one has ever supposed that a mechanic's lien could be enforced against the doorsteps or chimneys of a dwelling house, or that they could be sold and removed, to the utter destruction of the whole property."

In re Coe v. Columbus, etc., Railroad Co., 10 Ohio St. 372, 75 Am. Dec. 518, the court, on pages 547, 548, used the following language:

"We believe that we have disposed of all the questions which have been presented for our consideration except one, which is collateral, arising upon a cross-petition filed by Lincoln Goodale. The substance of the claim of Goodale is that, by an arrangement between him and the company, the latter was allowed to enter upon his lands and construct its road thereon, with such works as might be necessary for its completion; that within one year appraisers should be selected, and make an award of the amount to be paid to Goodale for such use of his land; that the amount of such award should be paid to Goodale within 60 days after it was made; that, upon failure, the license to enter upon and the right to use the lands should cease, and any right or interest of the company under the agreement, and its fixtures and works, should be and remain the property of Goodale, 'as if said agreement had not been made, and said company had, without authority and in its own wrong, entered upon said lands and made said road through the same.' The award having been made, but the payment of the amount awarded not made within the time, the court was asked to enforce, by injunction against the company and the receiver, the right of Goodale under the agreement, and to restrain the company from any use of the track constructed upon the lands. When a party voluntarily allows, for a stipulated consideration, such use of his property, he cannot, by agreement, secure a right to such an extraordinary remedy as an injunction. The insertion in the agreement of a stipulation that, in the event of its nonfulfillment, the party thus using the property is to be regarded as using its wrongfully and without authority cannot make the fact so in view of such a remedy. It is rather in the nature of a forfeiture, which a party certainly cannot come into a court of equity to enforce by an injunction. We think, therefore, that the court very correctly refused the injunction asked by Goodale, and properly left him to pursue such legal remedies as he might be advised to pursue."

In the case last cited the defendant went so far as to agree that, upon its failure to comply with its contract and pay the stipulated sum, it should be regarded as on the premises.

without right, but yet the court refused to restrain the company and the receiver from the use of the track by injunction.

In re McAulay v. Western Vermont R. R. Co., 33 Vt. 311, 78 Am. Dec. 627, which is an action of ejectment, it was held the payment of damages is a condition precedent to the acquiring of title by a railroad company of lands taken by condemnation for their road; but it was also held that such a condition was for the benefit of the landowner and might be waived by him even by parol. It was admitted that the landowner had full knowledge of the proceedings of the railroad company in locating and constructing its road upon the land before and during all the time of the construction, and that he did not interfere in any way to prevent the occupation of the land for the purpose of the road otherwise than by forbidding the men employed to work thereon until the damages were paid. The question was whether the landowner could upon the facts maintain an action of ejectment for the land. In the course of the opinion the court said:

"In these great public works, the shortest period of clear acquiescence, so as fairly to lead the company to infer that the party intends to waive his claim for present payment, will be held to include the right to assert the claim in any such form as to estop the company in the progress of their works, and especially to stop the running of the road after it has been put in operation, whereby the public acquired important interests in its continuance."

In re Dodd v. St. Louis & H. Ry. Co., 108 Mo. 581, 18 S. W. 1117, the court said:

"It is equally well settled that a party, who, with full knowledge, stands by and permits a company to expend large sums of money in the construction of a railway through his land without objection, forfeits his right of ejectment. [Citing cases.] This right is forfeited by virtue of the application of the doctrine of estoppel, as well as the intervention of public interest. Property in a railway is peculiar. A railway may be likened to a chain, which is worthless with one link out. The ejectment of the company from a mile or half a mile of its track almost wholly destroys the value of the entire line. The landowner knows this, and when he stands by and sees large sums of money expended on his land, and probably millions expended in the construction of the whole road, and interposes no objection, every consideration of justice and fair dealing requires that he should not be permitted to destroy such vast interests by wresting possession of a part of the road from the

company, and thus severing its connection. * * * In such case we can pertinently say that he who will not speak when he should ought not to be permitted to speak when he would."

Mr. Dalton claims to have protested against the enlargement of the wharf and trestles of the defendants some time in April, 1908; yet the plaintiffs did not commence this action until September 17, 1909. It is a fair inference from the testimony, therefore, that the language of his protest, coupled with the conduct of himself and the other plaintiffs, meant no more than that the plaintiffs would hold the defendants responsible in damages for any injury done to their access to navigable water by the further extension of the defendants' trestles, wharves, and warehouses.

Referring now to the second contention of the defendants, that, in any event, the defendants' structures do not cut off plaintiffs' access from their upland to deep water navigation. That question involves the inquiry as to what is meant by the right of access of the upland owner to deep water navigation. Does it mean that he can prevent by injunction or otherwise the erection of all structures in front of his holdings, except his easement is condemned for public purposes and paid for; or does it mean that plaintiff can only insist on the removal of structures which substantially interfere with his access to deep water navigation? The opinion of our appellate court in re Decker v. Pacific Coast Steamship Co., 164 Fed. 974, 91 C. C. A. 102, sheds considerable light on the subject now under consideration. In the course of the opinion, Mr. Justice Morrow, speaking for the court, quoting from Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331, said:

"He may have, however, a right of action against an intruder who places obstacles on the shore that prevent him from having access to the navigable waters."

Continuing, Justice Morrow said:

"This is the general rule, and is designed to keep navigable waters free and open to the public for commerce and navigation, and at the same time permit the littoral owner and those engaged in commerce and navigation to have access to navigable water; but it cannot be ascertained from the allegations of the complaint in this case, nor does it appear in evidence, in what manner the mainte-

nance of the buildings and wharf by the appellee in front of appellant's premises prevents her from having access to the navigable waters of Gastineaux Channel. The presumption is that such · access would be facilitated, rather than obstructed, by the maintenance of a wharf and other suitable structures for the accommodation of the public in the discharge and shipment of passengers and merchandise arriving and departing by water at the port of Juneau."

See, also, Columbia Canning Co. v. Hampton, 161 Fed. 64, 88 C. C. A. 224, also unreported opinion of this court in C. W. Young Co. v. Town of Juneau et al., 4 Alaska, 372.

In re Hedges et al. v. West Shore R. Co. et al., 150 N. Y. 150, 44 N. E. 691, 55 Am. St. Rep. 660, the Court of Appeals of the state of New York, among other things, said:

"The plaintiff's case rests entirely upon the proposition that the defendants have invaded and obstructed the right of access to the navigable highway. In the original condition of things, the strip of land under water, where the defendants' railroad now is, was affected with two distinct rights and interests that were liable to conflict with each other, and this litigation is really the result of such conflict. It arises largely, we think, from a misconception, on the part of the riparian owners, with respect to the nature, character, and extent of their rights. The riparian owner had nothing but a natural easement or right of access over this strip of land, as an incident of his ownership of the uplands. On the other hand, the sovereign owned the land, subject to such easement, and had the right to put the land to any use consistent with the exercise of the easement on the part of the riparian proprietor. The owner of the banks and shore could not so exercise his right of passage or access to the channel as to destroy, or unreasonably interfere with, the right of the sovereign to put its own land to such use as it thought proper. Where two such rights or interests exist, with respect to the same portion of the earth's surface, each must be exercised and enjoyed in a reasonable way. Each right or interest in such a case is always subject to the qualification that it cannot be exercised or enjoyed in such a way as to destroy the other. * * * · The owner of the uplands cannot exercise his easement or right of access to the channel in such a way as to prevent other parties, to whom the sovereign has granted the bed of the river, or some portion of it, from using their own property in a reasonable way. The rights of the parties in these respects are governed by the general rules of law applicable to easements and servitudes generally. * * * The sovereign (that is to say, the state) could have built a railroad upon the strip of land while it was the owner of it, and the then owner of the plaintiffs' uplands could not complain, providing he was given suitable and reasonable means of access to the channel. Instead of doing this, it has chartered a corporation for that purpose, and this corporation has acquired the

title of the state to the piece of land, and has constructed the railroad, and is operating it as a public common carrier. The corporation constructed the road upon its own land, under legislative authority, and provided for passageway, over the water beneath the structure, spaces 14 feet in width and 8 feet in height at high tide. The easement of access to the river by the owner of the lands on the shore was respected. It could still be enjoyed and exercised in a reasonable way, and in practically the same way that it had been enjoyed before, or was capable of enjoyment in its natural state. Hence the defendants or their predecessors in title invaded no property right of the riparian owner. The railroad company could have appropriated the easement upon making compensation, in the exercise of the right of eminent domain, or so constructed its works as to permit its future enjoyment and exercise in a reasonable and suitable manner. It elected to take the latter course, and therefore the structure was placed where it now is under lawful authority. The rights of the state to the land had been acquired in pursuance of law, and the easement of the upland owner had not in any legal sense been disturbed. If it was a lawful structure when placed in the river where it now is, it could not become unlawful in consequence of any changes that may have since taken place. Any other rule would make it impossible for a railroad to perfect its right to cross an inlet of a public river, since the right would then be subject to any and all changes that might take place in the use of the lands upon the shore, or to the enlargement of the means of access by the upland owner, as the development of his property might require. We do not hold that he is to be limited to such means of access as exist or are in use at the time of the construction of the railroad. He may insist at all times upon the enjoyment of the right of access in a reasonable manner, but not in such a way as would be inconsistent with the rights of the owner of the land which is subject to that right. In determining, in such cases, whether the property rights of the riparian owner have been invaded, we must bear in mind that these rights were not originally absolute, but qualified by other rights in the owner of the land in the bed of the stream, and that they cannot be enlarged at will or according to his convenience or necessity. So long as the natural condition of things is left practically unchanged, and opportunity afforded at all times for reasonable modes of access, the owner of the lands upon the shore has no just grounds of complaint."

In re Taylor v. Commonwealth, 102 Va. 759, 47 S. E. 875, 102 Am. St. Rep. 865, the court said:

"These rights of the riparian owner and the commonwealth must be exercised, if possible, so that the one shall not unnecessarily disturb or impair the enjoyment of the other. Appellant has built no wharf or pier, nor any like structure, upon her premises, nor does it appear that she contemplates doing so. When she does exercise that right, it must be in accordance with such rules and regulations

as the commonwealth imposes for the protection of the rights of the public. Nor does it appear that the right in the plaintiff of access to the water from her land, or of a right of way to and from her shore to the navigable part of the stream, has been interrupted or threatened, and the other enumerated rights are not called in question in this record. When the riparian owner complains of an injury done to him in respect to these rights, the question to be considered is: Does he present a case in which there has been any substantial interruption or impairment of his rights? Were he the owner in fee simple of the soil, any entry upon it without his consent would constitute a trespass; but, having mere easements in the river, the riparian owner has no cause of complaint, so long as he is permitted the full and undiminished enjoyment of those rights."

The evidence in this case shows that one of the mining claims described in the second amended complaint abuts on the navigable water of Orca Inlet for a distance of 1,000 or 1,200 feet. It further shows that the structures complained of by the plaintiffs are in front of said claim only for a short distance. If plaintiffs desire to construct a wharf from their upland to deep water navigation, there is nothing to prevent them from doing so by building from any portion of the westerly side line of the Bear mining claim in a northeasterly direction, which wharf would not be interfered with in any manner by the present wharf, warehouses, and trestles of the defendants. It is true the witness Dalton says that, owing to the prevailing north winds in the winter season, it would be impossible to dock a vessel at that point. The witnesses for the defendants, however, deny that there are any winds from that direction which would interfere with the landing of vessels at such a wharf. An examination of the topography of the surrounding country shows that that particular portion of the bay is protected by the projecting land to the northeast from the influence of the northerly winds. There is no proof to indicate that the defendants have had any difficulty in landing vessels at their wharf during all seasons of the year, nor does the record disclose anything, nor do the premises suggest any reason why plaintiffs cannot have access to deep water by the construction of such a wharf. The evidence further shows that, for all present needs and purposes of the plaintiffs, it would not be necessary for them to build a wharf of such

length, for they can easily bring vessels around to the land side of the northerly projection of the defendants' wharf and load or unload whatever machinery or lumber they desire on a short pier or wharf projecting northerly from Three Tree point and on the land side of the northerly projection of the defendants' wharf.

The witness Dalton insists that, since he is the owner of the upland, he has a right of access to deep water navigation in the most inexpensive manner which the topography of the ground will permit, and therefore that he should be entitled to wharf out directly from Three Tree point, and should be granted a mandatory injunction at this time restraining the defendants from maintaining their trestles, wharves, and railroad in front of him. But, as before stated, the plaintiffs should have insisted on such right before the incurring of such expense as the evidence shows the construction of such improvements entailed upon the defendants. Nor are the plaintiffs without a remedy, even though they did not act promptly in preventing the defendants from erecting structures in front of said upland. They still have an action for damages, and if it becomes necessary for them, in the prosecution of the work on their mining claims, to construct a wharf such as has been heretofore indicated, there is no apparent reason why they should not, in any action for damages they might see fit to institute against the defendants for injuring their right of access to navigable water, recover such damages as will be sustained by them in being compelled to erect a more extensive wharf than would be necessary had the defendants not built any structures in front of their upland.

Nor does it appear that plaintiffs will suffer on account of the refusal to grant the extraordinary remedy prayed for. For the defendants, in the first instance, had they seen fit, could have by appropriate condemnation proceedings cut off plaintiffs' access from deep water navigation by paying whatever damages plaintiffs would sustain by reason of any injury to such right of access. The plaintiffs still have that remedy, if they can show that their right of access has been substantially interfered with; but, as before stated, the evi-

dence before the court in this case does not warrant the court in saying that such access has been materially interfered with by the structures of the defendants, of which the plaintiffs complain.

After the taking of the testimony. and the submission of the cause to the court, the court took the same under advisement, owing to the fact that the judge who tried the cause desired to view the premises in controversy before rendering an opinion herein, and immediately after taking said cause under advisement, and on the 5th day of July, 1911, the court entered an order requiring the defendants forthwith to open a temporary roadway 28 feet in width by the alteration of their trestles in front of plaintiffs' log haul and to permit plaintiffs to construct a crossing over the railway of the defendants at a point east of the last switch, where such railway consists of a single track only. Such order was granted, however, for temporary purposes only. After carefully reviewing the pleadings, evidence, and the premises, it is apparent that such order was not justified under the circumstances, and that the court was without power to enter the same. Let an order, therefore, now be entered setting aside and holding for naught the said order entered by this court on the said 5th day of July, 1911.

Let findings of fact, conclusions of law, and decree be entered in accordance with this opinion.